# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

JASMINE E. BYERLEY,  )
      Plaintiff,  )
        )
v.  )     CAUSE NO.: 1:12-CV-91-JEM
        )
CAROLYN W. COLVIN, Acting Commissioner  )
of the Social Security Administration,  )
      Defendant.  )

## OPINION AND ORDER

This matter is before the Court on a Complaint for Judicial Review [DE 1], filed by Plaintiff Jasmine E. Byerley on March 22, 2012, and her Plaintiff's Memorandum in Support of Summary Judgment or Remand [DE 18], filed October 1, 2012. Plaintiff requests that the Administrative Law Judge's decision to deny her disability benefits be reversed or, alternatively, remanded for further proceedings. The Commissioner filed a response on January 13, 2013, and Plaintiff filed a reply on January 28, 2013. For the following reasons, the Court **GRANTS** Plaintiff's request for **REMAND** consistent with this opinion.

## PROCEDURAL BACKGROUND

Plaintiff Jasmine E. Byerley filed an application for Disability Insurance Benefits ("DIB") on November 8, 2007, and for Supplemental Security Income ("SSI") on October 31, 2007, alleging disability beginning on July 1, 2005. After her application was denied initially and on reconsideration, Plaintiff requested an administrative hearing. A hearing was held May 10, 2010, and the administrative law judge ("ALJ") found the Plaintiff not disabled from the alleged onset date through the date of her decision. The ALJ's decision became the Commissioner's final decision when the Appeals Council denied Plaintiff's request for review on January 18, 2012. *See* 20 C.F.R. § 404.981. Under 42 U.S.C. § 405(g), Plaintiff initiated this civil action for judicial review of the

Commissioner's final decision.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgement in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

## FACTUAL BACKGROUND

### I.      Background

Plaintiff was born on June 7, 1980, and was 30 years old on the date of the ALJ's decision. She is approximately 5'1" and 230 pounds and has completed the twelfth grade. Her past relevant work includes work as a gas station cashier, and she was insured through September 30, 2006, for DIB purposes.

### II.     Medical Evidence

Records dating from Plaintiff's first emergency room visit in May 2006 through July 2009 document Plaintiff's history of complaints of rapid heart rate and heart palpitations. Several 24-hour and 30-day Holter monitor tests were administered throughout that time period. Doctors interpreting the results noted one "rare occurrence" of a superventricular tachycardia and two incidents of premature ventricular complexes. Otherwise, the only abnormal results were for intermittent sinus tachycardia with no underlying physical abnormalities found to explain its source. An electrocardiogram ("EKG") from September of 2006 showed a structurally normal heart. A July 2009 EKG found borderline to mild concentric left ventricular hypertrophy but was otherwise normal. Cardiologist Dr. Horace Chastain wrote that Plaintiff's palpitations were not related to her heart and that the "vast majority" of her symptoms were "non-cardiac in nature."

Various medications were prescribed throughout her testing and treatment, with varying levels of success. After the initial emergency room visit in May 2006, Toprol was prescribed but caused weakness and other side effects. In September 2006, Plaintiff was switched to Cardizem. In June 2007, Coreg was added to her treatment when she complained that the Cardizem alone was not effective. In September 2007, Plaintiff had a follow-up exam, and the dosage of Coreg was increased because it seemed to be helping. At an examination in April 2008, Plaintiff reported that she had taken herself off all medications after becoming pregnant. Her doctor prescribed Propranolol, which he said was able to partially control her rapid heart rate once she began taking it as ordered.

Plaintiff's records also contain numerous complaints of headaches. In May 2004, she complained of daily migraines and wrote that her headaches had begun in 1991 or 1992. Dr. Thomas Curfman prescribed naproxen but changed the prescription to Zanaflex in June 2004 when Plaintiff reported the naproxen was not working. In August 2004, Plaintiff reported to Dr. Curfman that the Zanaflex helped some but that the she was still having headaches. In November of that year, she reported continued daily mild headaches and migraines with exposure to sunlight, and in December she said the Zanaflex was helpful but made her sleepy. She again complained of weekly incapacitating headaches to Dr. Curfman in October 2005, and he increased her dosage of Zanaflex. His next record of contact with Plaintiff is from May 2007 when she reported weekly headaches. He had her resume Zanaflex and did not see her again until March of 2008 when she reported fair success with Zanaflex but sleepiness as a side effect. Dr. Curfman prescribed Inderal instead. A record from October 2008 states that Plaintiff reported the Inderal was helping with both her heart and her headaches.

Plaintiff also has been diagnosed with fibromyalgia ("FM"). The earliest mention of FM in the records is a December 2004 letter from Dr. Curfman that included an impression for "possible fibromyalgia." He noted her daily, generalized pain and stated that she had found a website discussing FM which she thought explained her situation. On January 10, 2005, orthopaedist Dr. Dan Wilcox's records show an impression of "probable fibromyalgia," and he recommended an examination by a rheumatologist. On May 27, 2005, Plaintiff visited rheumatologist Dr. Karen Ringwald for testing. Dr. Ringwald's notes from October 2005 include an impression of FM. She encouraged Plaintiff to exercise and seek a support group for FM but otherwise recommended no specific treatment. She noted that the Cymbalta Plaintiff received as part of her psychiatric treatment would also be beneficial for her FM.

Plaintiff also has complained of right shoulder pain stemming from a June 2001 injury. An MRI done in February 2004 showed mild tendinosis without a rotator cuff tear. An orthopaedic surgeon saw no need for surgery and referred Plaintiff to another orthopaedic doctor. That doctor found some tenderness in the right shoulder and ordered an electromygraphy ("EMG") test. His records indicate that the EMG and MRI found no significant abnormalities.

Plaintiff also has a history of gastroesophageal reflux disease ("GERD") and irritable bowel syndrome ("IBS"). She initially complained of both in 2001 and was treated with a high fiber diet after tests discovered no underlying causes. She reported that symptoms of diarrhea and cramping returned in December 2003. She was put on new medications, and an endoscopy and colonoscopy with biopsies were ordered. All returned normal results. Another endoscopy and colonoscopy were performed in February 2009, and both were again normal.

Plaintiff also has diagnoses of asthma and mild sleep apnea. Records show occasional asthma flare-ups and frequent complaints of sinus and chest infections, shortness of breath, and chest tightness. A December 2009 report from Dr. James Pushpom, whom Plaintiff saw for sleep apnea studies, noted that Plaintiff's bronchial asthma was well controlled.

Consultative physical exams were performed by Dr. Milan Za in June 2007 and Dr. H.M. Bacchus in March 2008. Dr. Za wrote that Plaintiff's gate was normal and that she had no problem getting on and off the exam table or out of the chair. He noted a regular, normal heart beat. He found mild lower lumbar paraspinal tenderness but a normal range of motion in all joints and normal strength. Dr. Bacchus wrote that Plaintiff's gait and station were normal and that she was able to walk, hop, and squat normally. He also noted some muscle tenderness but with good range of motion and strength. He concluded that Plaintiff physically retained functional capacity for general, light duties.

The record shows that Plaintiff has been in treatment for mental health issues at Park Center since November 2002, when she was hospitalized for twelve hours due to suicidal thoughts. She was also hospitalized in Park Center's Transitional Care Services for two weeks in January of 2003 and for a week in February of 2003 for suicidal thoughts or actions. Except for a Global Assessment Functioning ("GAF") score of 45-50 assigned during her initial hospitalization, Park City records consistently report GAF scores of 50.

Plaintiff's treating psychiatrist at Park Center, Dr. Vijoy Varma, prepared two "Report of Psychiatric Status" documents for Plaintiff's disability application, dated March 2006 and April 2007. The first contained diagnoses of Bipolar II Disorder, Dissociative Disorder NOS, and Borderline Personality Disorder (Provisional) with a current GAF of 40. Dr. Varma wrote that

Plaintiff is frequently in conflict with others and often preoccupied with her physical illnesses. He wrote that her thought processes were coherent but tangential and easily distracted. He also had to stop the standard serial sevens test because she became anxious after making a mistake. He wrote that her daily activities included writing and crafts but that she claimed to stay in bed often due to migraines and FM pain. In the section on social functioning, Dr Varma stated that Plaintiff works hard to be friendly and likeable but has lots of chaotic relationships and becomes highly defensive and argumentative if criticized. He concluded that these conflicts, along with her mood swings and trouble concentrating "would limit [her] ability to work in a cooperative, productive way." AR 868. In response to a question about her ability to do simple work routines, he responded that her attendance would be inconsistent due to health problems, mood swings, irritability, and dissociation and that she would "not be able to maintain persistence nor pace and would require frequent breaks." AR 868.

The March 2007 report from Dr. Varma assigned a GAF of 50. He stated that Plaintiff tries hard to be likeable and friendly but that she is sometimes argumentative and that her interpersonal conflict "makes it difficult for her to manage her emotions and work in a cooperative, productive, consistent manner." AR 836. He wrote that she kept herself occupied with crafts and writing and was trying to work on cleaning her house but that it was currently in disarray. Tests of her memory, ability to calculate, abstract thinking, and judgment were all within normal ranges. Dr. Varma also noted that Plaintiff had been absent from treatment for over eighteen months.

Consultative psychological examinations were also done by Drs. Barbara Gelder and Wayne Von Bargen. Dr. Von Bargen's first report was dated March 2006. He wrote that the records contained no official diagnosis. He noted that Plaintiff appeared to adequately care for herself and

6

perform routine daily activities. He also wrote that she appeared to have a circle of supportive friends and that she remained fairly active on a typical day. He assigned a GAF of 50. Dr. Von Bargen performed a second consultative examination in March of 2008 and assigned a GAF of 55. His second report noted diagnoses of Bipolar Disorder, Dissociative Disorder, and possible PTSD and personality disorder. He again wrote that she appeared to adequately care for herself and perform routine daily activities. He also noted that her cognitive functioning appeared to be grossly intact.

Dr. Gelder's examination report is dated May 2007. She assigned a GAF of 47. She noted that Plaintiff's personal grooming habits and hygiene were adequate. Plaintiff reported activities of daily living that included getting up, getting dressed, doing her hair and brushing her teeth, going to appointments, doing things around the house, dealing with people in and out of the house, cleaning, cooking, shopping, and laundry. However, Plaintiff told Dr. Gelder that when she is sick, she stays in bed all day instead. Psychologist Kenneth Neville completed a Psychiatric Review Technique Form in June 2007 based on Drs. Varma and Gelder's reports as well as Dr. Von Bargen's first report. He concluded that Plaintiff had no severe mental impairments but that co-existing physical impairments required a referral to another specialist. He noted that records showed impairments existed that did not precisely satisfy the diagnostic criteria of Listing 12.04 and 12.06. He checked the boxes indicating mild limitations in activities of daily living and social functioning; no limitations in concentration, persistence, or pace; and no extended episodes of decompensation. Because he found no indications in the records of functional limitations brought on by mental impairments, he concluded that Plaintiff did not suffer from any severely limiting impairments. Finally, he repeated Dr. Gelder's GAF of 47, which he noted included physical as well as mental

limitations.

### III.   Plaintiff's Testimony

At the hearing, Plaintiff testified that her rapid heart rate "takes her breath away," can last minutes to hours, can occur when she is just sitting, and had occurred at least a dozen times in the year preceding the hearing. She stated that weekly headaches sometimes cause her to need to stay in a dark room all day. She also testified to abdominal pain due to GERD and IBS and to joint, hip, and back pain that she described as "[a]nywhere from fire to sharp and stabbing pains." She also stated that she suffers from sleep apnea and could not use her CPAP machine due to sinus issues. When questioned about her mental impairments, Plaintiff referred to her diagnoses of PTSD, bipolar disorder, and dissociative disorder. She said she is jittery and overly talkative and wants to buy things when in a manic phase. In her depressive phase, she does not want to leave the house, does little grooming, can sleep fifteen to twenty hours a day, and has troubles interacting with people and staying focused. She said she also suffers from obsessive compulsive disorder, causing her to need some things to be done in very particular ways. Plaintiff testified she stopped taking some of the medications prescribed for various illnesses when she became pregnant or to avoid the "zombie" effect they cause. According to Plaintiff, she spends a typical day alternating between sitting and lying down, does laundry some days, and cooks simple meals that do not require her to stand long. Finally, Plaintiff testified that her combination of impairments limits her to "sit or stand no longer than thirty to sixty minutes" and requires her to spend four out of eight hours lying down. Plaintiff also testified that her joint pain combined with pain from a past shoulder injury limits her to lifting no more than eight to ten pounds.

## IV.    Vocational Expert Testimony

Sharon Ringenberg testified at the hearing as the Vocational Expert ("VE").  The ALJ posed a hypothetical to the VE of an individual who is limited to essentially sedentary work but allowed to work sitting or standing and further limited to no contact with the general public, only brief and superficial contact with others, simple routine tasks, and no fast pace.  The VE testified that work available to the hypothetical individual included that of a final assembler, DOT 713.687–018 (75 in the northeast Indiana region; 500 in Indiana; 15,000 nationwide); addresser, DOT 209.587-010 (50 in the region; 400 in Indiana; 60,000 nationwide); and document preparer, DOT 249.587-018 (50 in the region; 400 in Indiana; 20,000 nationwide).  The VE further testified that an employee would have to be on task 80% of the day and could miss only one or two days a month to remain competitively employed in these positions.

## V.    The ALJ's Decision

The ALJ concluded that Plaintiff suffered from five severe impairments:  bipolar disorder, fibromyalgia, sinus tachycardia, reactive airway disease, and sleep apnea, but that those impairments did not meet or equal a Listed impairment.  The ALJ then determined that Plaintiff retained the functional capacity to perform less than a full range of sedentary work, requiring a sit/stand option and limited to simple, routine tasks that do not require a fast pace, any interaction with the general public, and only brief and superficial contact with supervisors and co-workers.  The ALJ found the Plaintiff not credible and her testimony exaggerated.  The ALJ concluded that the Plaintiff could not perform her past relevant work but could perform jobs that exist in a significant number in the economy, namely work as a final assembler, an addresser, and document preparer, and was, therefore, not disabled.

## STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ "uses the correct legal standards and the decision is supported by substantial evidence." *Roddy v. Astrue,* 705 F.3d 631, 636 (7th Cir. 2013) (citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010); *Prochaska v. Barnhart*, 454 F.3d 731, 734-35 (7th Cir. 2006); *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). "[I]f the Commissioner commits an error of law," the Court may reverse the decision "without regard to the volume of evidence in support of the factual findings." *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)).

At a minimum, an ALJ must articulate his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). An ALJ must "'build an accurate and logical bridge from the evidence to [the] conclusion' so that, as a reviewing court, we may assess the validity of the agency's final decision and afford [a claimant] meaningful review." *Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007) (quoting *Scott*, 297 F.3d at 595)); *see also O'Connor-Spinner*, 627 F.3d at 618 ("An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions."); *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001) ("[T]he ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits.").

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that he suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To be found disabled, the claimant's impairment must not only prevent him from doing his previous work, but considering his age, education, and work experience, it must also prevent him from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The steps are: (1) Is the claimant engaged in substantial gainful activity? If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to step two; (2) Does the claimant have an impairment or combination of impairments that are severe? If not, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to step three; (3) Do(es) the impairment(s) meet or equal a listed impairment in the appendix to the regulations? If yes, the claimant is automatically considered disabled; if not, then the inquiry proceeds to step four; (4) Can the claimant do the claimant's past relevant work? If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to step five; (5) Can the claimant perform other work given the claimant's residual functioning capacity ("RFC"), age, education, and experience? If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At steps four and five, the ALJ must consider an assessment of the claimant's RFC. The RFC "is an administrative assessment of what work-related activities an individual can perform despite [his] limitations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001) (citing SSR 96-8p, 1996 WL 374184 (Jul. 2, 1996); 20 C.F.R. § 404.1545(a)) (other citations omitted). The RFC should be based on evidence in the record. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(3)). The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ. *Zurawski*, 245 F.3d at 886; *see also Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

# ANALYSIS

Plaintiff argues that the ALJ committed errors by: (1) performing an inadequate analysis of whether Plaintiff met or equaled a Listing, (2) making a flawed credibility finding, (3) improperly failing to take evidence of all of Plaintiff's impairments into consideration in making her RFC assessment, and (4) finding that Plaintiff can still perform a substantial number of jobs in the economy. This Court finds that the ALJ insufficiently articulated her reasons for finding Plaintiff did not equal a Listing and for her credibility determination, necessitating remand.

## A.    Listing Determination

Plaintiff argues that the ALJ's analysis of whether Plaintiff met or equals a Listing was perfunctory and failed to account for much of the evidence in the record, necessitating remand. Specifically, Plaintiff argues that had the ALJ properly considered all the evidence in the record, she would have found Plaintiff met or equaled Listing 12.04 in 20 C.F.R. Part 404, Subpart P, Appendix 1 for affective disorders. This Court finds that the ALJ failed to adequately articulate why Plaintiff did not equal any Listing and remands for further examination.

At Step Three of the disability inquiry, an ALJ must determine whether the claimant's impairments meet or equal the criteria of an impairment listed in the appendix to the social security regulations. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). An individual suffering from an impairment that meets or is the equivalent of the description of a Listing is conclusively presumed disabled, and no further analysis is required. *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987). "To meet or equal a listed impairment, the claimant must satisfy all of the criteria of the listed impairment," and he "bears the burden of proving his condition meets or equals a listed impairment." *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999).

In the present case, Plaintiff asked the ALJ to find that she met Listings 3.10, 4.04, 5.06, 12.04, and 12.06. Plaintiff also asked that the effects of Plaintiff's obesity be taken into consideration in making the determination. The ALJ examined each of these Listings, as well as Listings 4.05 and 12.08, and found that necessary criteria were not satisfied. Plaintiff now argues that the ALJ should have found that Plaintiff met or equaled Listing 12.04 for affective disorders, but instead selectively discounted evidence in the record that was favorable to Plaintiff.

To meet the requisite level of severity under Listing 12.04, a claimant must suffer from a documented mental illness listed in Paragraph A that results in limitations in functioning listed in Paragraphs B or C. 20 C.F.R., Pt. 404, Subpt. P, App. 1 § 12.04. Paragraph A requires a medical diagnosis of depressive, manic, or bipolar syndrome. Paragraph B requires that the disorder found in Paragraph A result in at least two of the following functional limitations: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04. A "marked" limitation is one that is "more than moderate but less than extreme." 20 C.F.R., Pt. 404, Subpt. P, App. 1 § 12.00(C). Paragraph C provides alternate functional limitation criteria if Paragraph B criteria are not met. 20 C.F.R., Pt. 404, Subpt. P, App. 1 § 12.00(A).

In this case, the ALJ noted Plaintiff's diagnoses of bipolar disorder, which fulfills Paragraph A requirements of Listing 12.04. In assessing the Paragraph B requirements, however, the ALJ found that Plaintiff's bipolar disorder caused only mild limitations in activities of daily living and moderate limitations in social functioning and in maintaining concentration, persistence, and pace. She also found that Plaintiff suffered no episodes of extended duration of decompensation. She

therefore found that the Plaintiff failed to meet the functional limitation requirements of Paragraph B. The ALJ further found that Paragraph C criteria were not present and concluded that Plaintiff did not meet Listing 12.04.

Plaintiff takes issue with the ALJ's analysis of the Paragraph B criteria. She argues that the ALJ ignored Plaintiff's testimony, evidence in the record, opinions of treating physicians, and GAF scores that showed marked limitations. As evidence of limitations in activities of daily living, Plaintiff points to her testimony at the hearing and offers, without explanation, a list of pages in the record from medical sources that make reference to Plaintiff's difficulties with proper grooming and her inability to get out of bed some days. Plaintiff offers a similar string of citations to exhibits detailing Plaintiff's difficulties with interpersonal relationships as evidence of limitations in social functioning. Another string of citations to exhibits mentioning Plaintiff's racing thoughts and OCD is offered as evidence of limitations in concentration, persistence, or pace. However, Plaintiff offers no explanation of how the cited exhibits would require finding any of these Paragraph B functional limitations to be "marked" instead of mild or moderate. Much of this evidence was, in fact, explicitly addressed by the ALJ in finding these Paragraph B criteria to be mild or moderate only. The Court's own review of the evidence cited by Plaintiff finds nothing to show that the evidence upon which the ALJ based her Paragraph B findings was not substantial.

Plaintiff also argues that the ALJ ignored "treating opinions . . . that show marked limitations" but does not point to any specific language in those opinions to support this argument. The ALJ acknowledged some of Dr. Varma's most explicitly negative assessments of Plaintiff's functioning but focused on the evidence from his reports that Plaintiff tried hard to be likeable and friendly and was able to successfully complete most of the cognitive tests administered to her.

While Dr. Varma's reports contain plenty of evidence of functional limitations, the facts relied on by the ALJ are substantial evidence to support finding these limitations not marked.

Plaintiff further argues that the ALJ improperly discounted GAF scores, both from treating and consulting medical sources, that Plaintiff believes indicate marked functional limitations. Plaintiff consistently was rated with GAF scores of between 47 and 55. Plaintiff's argument implies that her consistent ratings reflecting "serious impairment" equate to an assessment by treating and consulting physicians that Plaintiff's functional limitations in two or more of the Paragraph B areas were "marked." As the ALJ notes in her decision, however, the functioning measured by GAF scores does not necessarily correlate to the specific areas of functioning measured in Paragraph B of Listing 12.04. *See Wind v. Barnhart*, 133 Fed. App'x 684, 692 n.5 (11th Cir. 2005) ("[T]he Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' and has indicated that GAF scores have no 'direct correlation to the severity requirements of the mental disorder listings.'" (quoting 65 Fed. Reg. 50,746, 50,764-65 (Aug. 21, 2000))); *Wilkens v. Barnhart*, 69 Fed. App'x 775, 780 (7th Cir. 2003) ("[N]owhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score."); *cf. Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (permitting an ALJ to discount a GAF score because it may reflect the severity of symptoms and not necessarily "reflect the clinician's opinion of functional capacity").

The regulations state that "the better an explanation a source provides for an opinion, the more weight we will give that opinion." 20 C.F.R. § 1527(c)(3). Accordingly, the ALJ gave less weight to the GAF scores assigned by consulting medical sources than to the narratives which accompanied them, narratives which offered a more granular assessment of Plaintiff's functioning

and more directly addressed the specific areas of functioning contained in Paragraph B. For example, the ALJ cited statements from Plaintiff that she practiced fighting, rode her bike, hung out with friends, and did crafts as evidence of her activities of daily living; observations by Dr. Von Bargen that she appeared to have a supportive circle of friends as evidence of her social functioning skills; and notations from Dr. Von Bargen that her cognitive function appeared grossly intact as evidence of her concentration, persistence, and pace. Along with other facts cited from Dr. Gelder's examination, these facts constitute substantial evidence to support the ALJ's Paragraph B findings.

Plaintiff next argues that the ALJ should have found that Plaintiff's impairments "equaled" a Listing due to the combined severity of her impairments even if she failed to meet Listing 12.04. When a claimant's impairment fails to manifest the specific criteria of a Listing, she will still be found conclusively disabled if her impairment or combination of impairments "equals" a Listing. 20 C.F.R. §§ 404.1526(c)(5). To "equal" a Listing, the impairment(s) must be at least equal in severity and duration to the criteria of a listing. 20 C.F.R. § 404.1526(a). A claimant with a combination of impairments, none of which individually meets a Listing, will be found to equal a Listing if the findings related to those impairments are at least of equal medical significance to the findings of a closely analogous listed impairment. 20 C.F.R. § 1526(b)(3). Because equivalence involves medical judgment, an ALJ must look to expert opinions in making her finding. *Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004) (citing 20 C.F.R. § 404.1526(b)(2004); S.S.R. 96–6p, 1996 WL 374180, at *3 (July 2, 1996) ("[L]ongstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight.")).

In this case, Plaintiff argues that the ALJ failed to consider her combination of impairments in deciding whether she equaled a Listing. Plaintiff catalogs a long list of both physical and mental impairments with which Plaintiff has been diagnosed or of which she has complained, followed by an equally long list of resulting symptoms. Although Plaintiff does not specify which Listing Plaintiff's impairments might equal or how, the most logical reading of her brief is an argument that she equals Listing 12.04.

The ALJ's decision contains a thorough and detailed discussion of why Plaintiff does not meet any of the Listings. However, other than specifically rejecting obesity as combining with physical impairments to equal a Listing, the discussion of equivalence is limited to the statements that Plaintiff "does not have an impairment or combination of impairments that meet or medically equal one of the listed impairments," and that "her mental impairments do not meet or medically equal the criteria of any of the listings." AR 15, 16. Despite the ALJ's overall thoroughness, her decision lacks a meaningful discussion of equivalence that would allow this Court to determine whether she properly considered, for example, how Plaintiff's physical limitations might combine with her mental impairments such that the Paragraph B criteria are equaled or not. *See, e.g.,* S.S.R. 02-1p, 2002 WL 34686281, at *3 (Sept. 12, 2002) ("Obesity may also cause or contribute to mental impairments such as depression.").

Plaintiff further argues that the ALJ improperly made a medical conclusion regarding equivalence by failing to seek expert opinion evidence when none existed in the record. Whether an impairment or combination of impairments equals a Listing is a legal question reserved to the ALJ. 20 C.F.R. § 404.1527(d)(2). However, an ALJ is not a medical expert and cannot judge the severity of an impairment. *Barnett*, 381 F.3d at 670. Therefore, some expert evidence regarding

equivalence must be in the record for the ALJ to consult in making her finding. *Id.* The Commissioner argues that completed Disability Determination and Transmittal ("DDT") forms in the record fulfill this requirement. *See* 20 C.F.R. § 404.1527(e)(2)(ii) (allowing DDTs from the initial determination and reconsideration phases to constitute expert opinion evidence when part of the record before an ALJ). The ALJ, however, never mentioned any of these DDTs in her decision. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."). If she did consider them, she did not discuss the weight she gave to them. *See* 20 C.F.R. § 404.1527(e)(2)(iii) ("[T]he administrative law judge must explain . . . the weight given to the opinions of a State agency medical or psychological consultant."). The only related form mentioned by the ALJ was a June 6, 2006, Psychiatric Review Technique Form that explicitly excluded physical impairments from its assessment. Because the psychologist who prepared the form did not consider physical impairments, it cannot be relied on as expert opinion that Plaintiff's combination of physical and mental impairments do not equal a Listing. Because the ALJ cited no expert evidence in making her decision on equivalence, the decision is not supported by substantial evidence. S.S.R. 96–6p, 1996 WL 374180, at *3. On remand, the ALJ is instructed to obtain an expert medical opinion regarding equivalence if none can be found in the record.

**B.    Credibility Finding**

Plaintiff argues that the ALJ failed to provide specific reasons for finding Plaintiff's testimony regarding the severity and limiting effects of her conditions "exaggerated" or "less than credible" and also improperly discounted her testimony based solely on a lack of substantiating objective medical evidence.

In assessing a claimant's RFC, an ALJ must take into consideration all relevant evidence in the record, including a claimant's own hearing testimony regarding her symptoms. *See* 20 C.F.R. § 404.1545(a)(1); *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). However, when a claimant's testimony is not substantiated by objective medical evidence, an ALJ need not take a claimant's testimony about subjective symptoms and their limiting effects at face value. *See Rucker v. Chater*, 92 F.3d 492, 496 (7th Cir. 1996) ("[N]either are we required to give full credit to every statement of pain." (quoting *Pope v. Shalala*, 998 F.2d 473, 486 (7th Cir. 1993))). If the ALJ declines to give full credit to a claimant's statements, however, the ALJ "must make a finding on the credibility of the statements based on a consideration of the entire case record" to explain why they were discounted. S.S.R. 96-7p, 1996 WL 374186, at *2 (July 2, 1996). A lack of objective medical evidence alone may not be grounds for disregarding a claimant's statements regarding the severity or limiting effects of symptoms. S.S.R. 96–7p, 1996 WL 374186, at *6. An ALJ's credibility determination is entitled to substantial deference by a reviewing court and will not be overturned unless the claimant can show that the finding is "patently wrong." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006). However, when the credibility finding is based solely on "objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (quoting *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994)).

Social Security Ruling 96-7p provides that the "determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight

the adjudicator gave to the individual's statements and the reasons for that weight." S.S.R. 96-7p, 1996 WL 374186, at *4. To be sufficiently specific, it must "build a logical bridge from the evidence to [the] conclusion, but need not provide a complete written evaluation of every piece of testimony and evidence." *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012) (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005)). Plaintiff argues that the ALJ failed to give specific reasons other than a lack of supporting objective medical evidence for discounting Plaintiff's testimony regarding her symptoms.

The ALJ began the credibility determination by summarizing, without commentary, Plaintiff's testimony regarding her physical impairments. The ALJ then wrote that Plaintiff's "presentation" was "less than credible" and "appear[ed] exaggerated" and that the "medical evidence fail[ed] to show her conditions are as severe or as limiting as her testimony suggests." AR 18. She followed with a lengthy summary of Plaintiff's treatment for her rapid heart rate. The ALJ, although acknowledging Plaintiff's rapid heart rate as a real symptom, noted numerous diagnostic tests finding no underlying physical abnormalities and opinions of doctors that the problem was "non-cardiac in nature." She also stated that the condition "was responsive to medication therapy," listing various medications taken by Plaintiff, noting their relative effectiveness and reasons Plaintiff stopped taking them. The ALJ concluded that "the claimant's treatment records show that her cardiac condition limits her, but not so significantly that she cannot perform work activities." AR 19. She continued, "Most notably, the records indicate that her symptoms are brought on, exacerbated by stress, strenuous activity, and noncompliance with medication therapy." *Id.*

The Commissioner argues that the ALJ's inclusion of Plaintiff's hearing testimony, mostly normal diagnostic testing, treatment history, and discussion of the use of medications, their side

effects, and reasons for noncompliance in her decision shows that the ALJ "considered" these factors in making her credibility finding.  These factors are, indeed, important factors to consider in making a credibility determination.  *See* S.S.R. 96-7p, 1996 WL 374186, at *3.  However, the mere inclusion of these facts without a "logical bridge" linking them to the ALJ's conclusions does not allow for meaningful review.  In this case, the decision lacks reasoning for *how* these factors show Plaintiff's testimony to be exaggerated or not credible.  *Cf. Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) ("The ALJ should have explained the 'inconsistencies' between Zurawski's activities of daily living [and] his complaints of pain" instead of just listing daily activities and stating they were inconsistent with claimant's complaints of pain in finding those complaints not credible.).  The only real reasoning the ALJ includes in finding Plaintiff's statements about her heart condition not credible is that they are not supported by the medical evidence, and this reason by itself cannot be grounds for discrediting a claimant's testimony.  *Clifford*, 227 F.3d at 872.  The ALJ's assessment of Plaintiff's mental RFC similarly summarized Plaintiff's testimony and mentioned factors relevant to credibility, but she failed to connect the two.  Because the ALJ also stated that if Plaintiff's testimony were found to be fully credible, she would be disabled, the Court remands the decision with instructions to make specific findings regarding which of Plaintiff's testimony she found to be not credible and explain which factors led to that conclusion and how.

## C.    Residual Functioning Capacity

The Plaintiff argues that the ALJ failed to build an accurate and logical bridge between the evidence and her conclusion regarding Plaintiff's RFC.  Specifically, she argues that the ALJ failed to properly weigh and consider all evidence in the record.  RFC is an ALJ's assessment of what specific work-related functions a person is still capable of doing despite her physical and mental

limitations brought on by medically determinable impairments and their related symptoms. 20 C.F.R. § 404.1545(a)(1). To make the RFC assessment, an ALJ must consider all relevant medical and other evidence related to medically determinable impairments in the record, including those impairments that the ALJ has found to be non-severe. 20 C.F.R. § 404.1545(a)(2)-(3).

Plaintiff first argues that the ALJ failed to discuss the effects of her fibromyalgia on her RFC determination. The ALJ explicitly mentioned fibromyalgia in her RFC determination only once—noting while discussing Plaintiff's muscle and joint complaints that physical examinations from rheumatology specialist Dr. Karen Ringwald showed "tender points characteristic of fibromyalgia" but were otherwise "unremarkable." AR 20. Plaintiff's apparent argument is that this discussion does not take into account the various symptoms besides muscle and joint pain that may accompany or be aggravated by fibromyalgia. She provides a list of symptoms—like fatigue, weakness, headaches, sleep problems, abdominal pain, and IBS—that may accompany fibromyalgia according to the National Institutes of Health, followed by a string of citations to the record in which those symptoms appear. Dr. Ringwald did note that Plaintiff's IBS, fatigue, migraines, heart palpitations, and sleep disorder "follow along likely with her fibromyalgia diagnosis." AR 534. However, her reports offer no insight into the severity of these symptoms or into the effects of Plaintiff's fibromyalgia on her functional abilities. The rest of the records cited by Plaintiff do not indicate whether the symptoms are related to her fibromyalgia and offer no insight into how her fibromyalgia affects her functioning. The burden was on Plaintiff to make this connection, and she failed to satisfy that burden. *See Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013) ("[T]he burden was on [Plaintiff] to explain why she was disabled as a result of her depression.")(citing *Scheck,* 357 F.3d at 702; 20 C.F.R. § 404.1512(c)). Therefore, the ALJ did not err in neglecting to address these

symptoms specifically in relation to Plaintiff's fibromyalgia.

Plaintiff further argues that the ALJ did not properly account for the severity of Plaintiff's cardiac problems, breathing problems, IBS, and headaches in her RFC. First Plaintiff complains that the ALJ's reducing her RFC to sedentary work in order to avoid stress and exertion that might trigger her tachycardia is insufficient because it fails to take into account Plaintiff's testimony that her tachycardia can occur even when resting. If the ALJ still finds that testimony not credible on remand, however, it need not be accommodated in her RFC. Next, Plaintiff argues that the ALJ incorrectly found her tachycardia to be responsive to medication, causing her to underestimate its effects on Plaintiff's RFC. The ALJ cites several exhibits in the record in which medications, exercise, and use of a CPAP machine were able to control Plaintiff's tachycardia. Although an argument can be made that the responsiveness to medication was inconsistent, the ALJ's finding need only be supported by substantial evidence, which the cited evidence is. Finally, Plaintiff argues the ALJ improperly found Plaintiff's migraines, headaches, and IBS to be non-severe, resulting in their limitations being excluded from Plaintiff's RFC. However, despite not finding these impairments to be severe, the ALJ did, in fact, discuss them as required in determining Plaintiff's RFC.

Plaintiff also argues that the ALJ's assessment of Plaintiff's mental RFC is faulty because it cannot be reconciled with her low GAF scores, scores which she says the ALJ improperly discounted. Plaintiff cites *Campbell v. Astrue* for the proposition that a GAF of 50 does not "support a conclusion that Plaintiff if mentally capable of sustaining work." 627 F.3d 299, 307 (7th Cir. 2010). However, the court in *Campbell* was concerned that the ALJ ignored entire sections of a mental health report, only one of which was the GAF of 50. *Id.* at 306-07. It did not state

categorically that a GAF of 50 warrants a finding of disability. Plaintiff also challenges the ALJ's decision to discount GAF scores assigned by consulting psychiatrists Drs. Gelder and Von Bargen. She argues that while a treating psychiatrist uses GAF scores for the planning and assessment of treatment and not to assess the functioning with which disability regulations are concerned, the same cannot be said of consulting psychiatrists who are hired specifically for the purpose of assessing functioning for disability claims. This argument is, however, too broad of a reading of the case she cites in support of it. *See Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) (reasoning that consulting psychiatrists are not likely to write opinions favorable to claimants purely out of sympathy like a treating physician might). The reasoning in *Bjornson* does not change the fact that GAF scores are a clinical tool that no regulations or case law have ever given any legal effect. *See Denton*, 596 F.3d at 425 (permitting an ALJ to discount a GAF score because it may reflect the severity of symptoms and not necessarily "reflect the clinician's opinion of functional capacity").

Plaintiff also argues that the ALJ failed to address Plaintiff's obesity in making her mental RFC determination. Specifically, Plaintiff faults the ALJ for not considering how Plaintiff's obesity was "tied in some reports to her depression." Pl.'s Br. 19. Social Security Ruling 02-1p requires that an ALJ discuss any functional limitations resulting from or aggravated by obesity whenever obesity has been identified as an impairment. S.S.R. 02-1p, 2002 WL 34686281, at *6-7 (Sept. 12, 2002). Plaintiff cites her own testimony that she was thin before she got sick, notes from her nutritionist about weight loss, and a summary of a consultation for lap band surgery to support her argument. Nothing in these exhibits, however, makes any link between Plaintiff's depression and her obesity. Even if such a link exists, Plaintiff offers no explanation for how it would affect her RFC; therefore, a remand on this point would not affect the outcome of this case. *See Skarbek v.*

*Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (applying harmless error review to ALJ decision).

Additionally, the ALJ took into consideration the opinions of treating psychiatrist Dr. Varma, who made frequent notes of and had the opportunity to consider the effects of Plaintiff's obesity on her mental functioning. Therefore, the ALJ indirectly took Plaintiff's obesity into account in making her RFC determination, so any failure to explicitly discuss obesity was harmless. *See Prochaska*, 454 F.3d. at 737 ("Because Prochaska 'failed to specify how [her] obesity further impaired [her] ability to work,' and because the record relied upon by the ALJ sufficiently analyzes her obesity, any error on the ALJ's part was harmless." (quoting *Skarbek*, 390 F.3d at 504)).

The ALJ took into consideration all of Plaintiff's impairments, alone and in combination, in determining Plaintiff's RFC. She also sufficiently explained the reasoning for the weight she gave evidence in the record and for how it affected her determination. Therefore, Plaintiff's argument that the ALJ failed to build a logical bridge between the evidence and her RFC conclusion fails.

**D.      Other Work in the Local Economy**

Plaintiff finally argues that the hypothetical posed to the VE at the hearing was incomplete, resulting in an incorrect decision on the ultimate question of whether there are jobs in significant numbers in the economy which the Plaintiff could perform. She first argues that the hypothetical was incorrect because it was based on a faulty RFC assessment. Because this Court found the ALJ's RFC assessment proper, these arguments are unavailing.

Plaintiff also argues that the hypothetical posed to the VE failed to include how often Plaintiff would have to alternate between sitting and standing. Social Security Ruling 96-9p states that the "RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing" in order for the VE to eliminate jobs from consideration that could not

accommodate that need. S.S.R. 96-9p, 1996 WL 374185, at *7 (July 2, 1996). In this case, the ALJ described the Plaintiff to the VE as requiring a sit-stand option "so work can be done both sitting and standing." AR 60. Because the VE would necessarily have to eliminate all jobs that require less frequent alternating between sitting and standing, this phrasing is even more restrictive than giving specific intervals. *See Ketelboeter v. Astrue*, 550 F.3d 620, 626 (7th Cir. 2008) ("Changing positions 'as needed' allows an employee broad flexibility and thus has a more restrictive effect on the jobs available to him than the limitation Ketelboeter thinks the ALJ should have described."). Therefore, the ALJ's failure to describe specific intervals was harmless.

Plaintiff next argues that the ALJ's hypothetical of someone requiring work that is "simple and routine and does not require a fast pace of production" failed to account for Plaintiff's limitations in concentration, persistence, and pace. Hypotheticals posed to VEs must include all limitations supported by medical evidence, including limitations in concentration, persistence, and pace. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010). In this case, at Step Three the ALJ found generally that Plaintiff had moderate limitations in concentration, persistence, and pace. She elaborated in her RFC analysis that mental evaluation reports showed Plaintiff to be distracted, impatient, and anxious during standard tests used to assess concentration, persistence, and pace. The ALJ concluded that Plaintiff "has a tendency to become anxious if presented with a somewhat complex task" and that she, therefore, "would have difficulty performing complicated, complex, and detailed tasks as well as tasks that need to be completed at a fast pace." AR 25. Accordingly, she limited Plaintiff to "tasks that are simple and routine and do not require a fast pace of production" in her RFC and posed the hypothetical to the VE of someone who would be limited to "simple, routine tasks and no fast pace." AR 25, 60. This hypothetical posed was completely

consistent with the ALJ's RFC analysis. Although the ALJ's Listing determination described limitations in concentration, persistence, and pace more generally, the RFC discussion addressed the limitations more specifically, and those limitations were sufficiently covered by the hypothetical. *See Allbritten v. Astrue*, No. 2:11-cv-116, 2012 WL 243566, at *7 (N.D. Ind. Jan. 15, 2012) (concluding that evaluation of limitations in concentration, persistence, and pace for Step Three purposes are distinct from RFC analysis). If Plaintiff's argument is that the RFC itself fails to adequately reflect Plaintiff's limitations in concentration, persistence, and pace, she fails to point to any evidence in support of this argument.

Finally, Plaintiff argues that the ALJ failed to resolve conflicts between the Dictionary of Occupational Titles and the VE's testimony. To determine whether jobs exist in the economy for a claimant's RFC at Step Five, the ALJ will look to job information available from government publications like the DOT. 20 C.F.R. § 404.1566(d). An ALJ may also use a VE to determine which occupations, if any, are compatible with a claimant's RFC. 20 C.F.R. § 404.1566(e). If using a VE, an ALJ has an "affirmative responsibility" to ask whether a vocational expert's testimony conflicts with the DOT and to elicit a "reasonable explanation" for any conflict. S.S.R. 00-4p, 2000 WL 1898704, at *4 (Dec. 4, 2000); *Overman v. Astrue*, 546 F.3d 456, 462-63 (7th Cir. 2008); *Prochaska*, 454 F.3d at 735. If the VE responds that a conflict exists or if a conflict is apparent, an ALJ may rely on the VE's testimony as substantial evidence to support a determination of non-disability only if she resolves the conflict in favor of the VE's testimony and explains why. S.S.R. 00-4p, 2000 WL 1898704, at *4; *Overman*, 546 F.3d at 463.

In this case, the ALJ began her questioning of the VE by asking, "Will your testimony be consistent with the DOT . . . and if not, will you advise me of the inconsistency and how you

resolved it?" to which the VE responded, "Yes." AR 60. The VE did not identify any conflicts during her testimony. The ALJ and the Plaintiff's counsel also made no mention of conflicts at the hearing. Plaintiff's first argument—that the ALJ must ask the VE if conflicts exist only *after* she testifies about the requirements of a job—has been rejected by the Seventh Circuit Court of Appeals. *Weatherbee v. Astrue*, 649 F.3d 565, 570 (7th Cir. 2011) (stating that S.S.R. 00-4p "does not specify whether this inquiry should (or must) occur before or after a VE testifies").

Plaintiff also argues that even though the VE did not herself identify any conflicts between her testimony and the DOT, apparent conflicts existed that should have alerted the ALJ to ask for an explanation and that required resolution by the ALJ prior to making her determination of non-disability. Specifically, Plaintiff states that the VE's testimony—that work as a final assembler, addresser, or document preparer is compatible with Plaintiff's RFC—conflicts with the DOT descriptions of those jobs because they require frequent, repetitive motions, while Plaintiff's RFC limits her to work that does not require a fast pace. She also argues that the DOT makes no allowance for a sit/stand option in those job descriptions, in conflict with the VE implicit testimony that they are compatible with a sit/stand option. Even if the Court accepts that these are actual conflicts, the key question in deciding whether the ALJ had a duty to resolve them under Ruling 00-4p is whether the conflicts should have been apparent to the ALJ. *Overman*, 546 F.3d at 463 (holding that when Plaintiff's counsel fails to identify conflicts at the time of the hearing, "SSR 00-4p requires only that the ALJ investigate and resolve *apparent* conflicts"). The transcript of the hearing gives no indication that the jobs identified by the VE require frequent, repetitive motion or that they would not allow for alternating between sitting and standing at the worker's discretion. The DOT does not address the frequency or repetitiveness of the motions the jobs entail, nor do the job

descriptions preclude alternating sitting and standing as needed. Therefore, no conflicts were apparent. *Weatherbee*, 649 F.3d at 570 (stating that "a conflict is apparent if it is 'so obvious that the ALJ should have picked up on [it] without any assistance'") (quoting *Overman*, 546 F.3d at 463). The ALJ fulfilled her responsibilities under Ruling 00-4p by asking and accepting the VE's answer about whether conflicts existed and can rely on the VE's expert testimony as substantial evidence of work in the economy compatible with Plaintiff's RFC. *Overman*, 546 F.3d at 462-63.

Finally, Plaintiff argues that Commissioner failed to meet her burden of proving that there were a significant number of jobs in the economy that Plaintiff is capable of performing. An individual will be found disabled at Step Five only if she "cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A). The VE identified a total of 175 jobs in the northeast Indiana region, 1,400 jobs in the state of Indiana, and 95,000 jobs nationwide that a person with Plaintiff's RFC could perform. As Plaintiff acknowledges, the Seventh Circuit has never established a lower limit for what constitutes "significant numbers." Pl.'s Br. 25 (citing *Lee v. Sullivan*, 988 F.2d 789, 794 (7th Cir. 1993)). The Plaintiff cites a recent Ninth Circuit Court of Appeals case that held that neither 135 jobs in the region nor 1,680 jobs nationwide were "significant numbers." *Beltran v. Astrue*, 700 F.3d 386, 390 (9th Cir. 2012). However, the Seventh Circuit has cited approvingly an Eleventh Circuit case in which as few as 174 was held to be a "significant number" of jobs in the region. *Lee*, 988 F.2d at 794 (citing *Allen v. Bowen*, 816 F.2d 600, 602 (11th Cir. 1987)); *Liskowitz v. Astrue,* 559 F.3d 736, 743 (7th Cir. 2009) (same). Based on this precedent, the VE's testimony that 175 jobs in the region constitutes substantial evidence supporting the ALJ's determination that

"significant numbers" of jobs exist in the economy are compatible with Plaintiff's RFC.

**CONCLUSION**

The Court finds that the ALJ failed to sufficiently articulate her analysis of the evidence in order to allow the reviewing court to trace the path of her reasoning. *See Giles,* 483 F.3d at 487. An ALJ must give enough information for the reviewing court to consider her reasoning and be assured that all of the important evidence was properly considered. In this case, the ALJ failed to do so in articulating her credibility determination and in determining whether Plaintiff equaled a Listing. Therefore, to this extent the Court **GRANTS** the Plaintiff's Memorandum in Support of Her Motion for Summary Judgment or Remand [DE 18] and **REMANDS** this matter for further proceedings consistent with this opinion. However, the Court **DENIES** Plaintiff's request to award benefits.

SO ORDERED this 14th day of May, 2013.

s/ John E. Martin
MAGISTRATE JUDGE JOHN E. MARTIN
UNITED STATES DISTRICT COURT

cc:     All counsel of record